# United States Court of Appeals

## For the First Circuit

No. 06-2187

LUCIA ENICA,

Plaintiff, Appellant,

v.

ANTHONY J, PRINCIPI, Secretary of the Department
of Veterans Affairs; DEPARTMENT OF VETERANS AFFAIRS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,
and Delgado-Colón,[*] District Judge.

Sanford A. Kowal, on brief for appellant.
Gina Walcott-Torres, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, on brief for
appellees.

October 6, 2008

---

[*] Of the District of Puerto Rico, sitting by designation.

**DELGADO-COLÓN**, **District Judge**. On June 28, 2004, appellant, Lucia Enica ("Enica" or "Appellant"), a registered nurse employed by the Department of Veterans Affairs, brought suit against the Secretary of Veterans Affairs ("VA" or "Appellee"), alleging that the VA failed to accommodate her disability in violation of the Rehabilitation Act, 29 U.S.C. §§ 791 and 794(a), and that, after she sought accommodations and submitted a worker's compensation claim, retaliated against her by failing to accommodate her, subjecting her to a hostile work environment, and denying her a promotion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. Each party moved for summary judgment and on May 30, 2006, the district court entered a memorandum and order denying Enica's motion for summary judgment and granting the VA's motion for summary judgment. Enica v. Principi, Civ. No. 04-11468, 2006 WL 1540486 (D. Mass. May 30, 2006). Enica appealed. We affirm in part and vacate in part.

## I.  Background

The following facts are presented in a light most favorable to the non-moving party Enica. See Plumley v. S. Container Inc., 303 F.3d 364, 367 (1st Cir. 2002).

### A.  Enica's Disability and Requests for Accommodations

1.  Medical History and Educational Background

Enica was diagnosed with poliomyelitis as a child. The disease caused her to suffer nerve damage and paralysis in her

-2-

right leg beginning at ten months of age. When she was approximately twelve years old, she fractured her right femur and underwent several reconstructive surgeries, leaving her right leg shorter than her left. She also suffers from severe arthritis in her right knee, and ankylosis, a condition causing stiffness, in her right ankle. She walks with a limp, drives a specially equipped car and has limited ability to lift. Enica obtained a bachelor's degree in nursing from New York University, a master's degree in psychiatric nursing from University of Massachusetts at Lowell and has nineteen years of experience working as a nurse.

2. Employment History Prior to EEO Claim

In 1994, Appellant was hired as a Registered Nurse of Psychiatry at the VA hospital in Jamaica Plain. Her responsibilities included providing basic care for patients with physical and emotional needs. Prior to commencing her employment, she underwent a "fitness for duty" examination which concluded that she had no conditions limiting her ability to work as a psychiatric nurse.

In 1995, Enica learned that the psychiatric unit in which she worked was closing. Concerned that she might be transferred to a medical unit, she approached her manager, Mary Farren ("Farren"), and explained that her physical condition precluded her from performing the work required of nurses in the medical units. Enica also informed the Chief of Nursing, Carol Coulter ("Coulter"), and

the Assistant Chief of Nursing, Cecilia McVey ("McVey"), about the limitation of her physical condition and inability to work in a medical unit. She was subsequently transferred to another psychiatric unit within the Jamaica Plain campus.

Thereafter, sometime in 1996, Enica was asked to push a patient on a stretcher to and from an electric compulsive shock therapy ("ECT") room and to assist him into bed. She informed Beverly Reardon ("Reardon"), her supervisor at the time, that she was in pain and could not perform said tasks. Reardon asked Enica to bring a medical certificate explaining her limitations and restrictions. In May of 1996, Enica saw Dr. Richard Wright, an orthopedist. After an examination, Dr. Wright stated and recommended that Enica should avoid repetitive low back activity, repetitive or heavy pushing and pulling, and indicated that she was not suited for medical or surgical floor assignments. In his recommendation he noted that "[i]t is not possible to spell out restrictions for all circumstances patient must be permitted some discretion."

Enica submitted this assessment to Reardon, who requested that she undergo another medical examination to determine if she was physically capable of performing the duties of a staff nurse. Dr. John Harris, III, Chief of Orthopedic Surgery at the VA, conducted an examination in July of 1996 and concluded that Enica

could not lift, carry, or push forty-five pounds.[1]  Dr. Harris' report indicated that he notified Enica of his diagnosis and advised that she go to her supervisors.

According to the VA, after Enica returned to work, her job functions were modified inasmuch as she was excused from carrying or pushing more than forty-five pounds.[2]  Once this modification was put in place, the VA claims that Enica did not speak to anyone in a VA management position about her disabilities from 1996 to 2002.

In contrast, Enica claims that while Dr. Harris' report was timely delivered to the VA, she was neither informed of his suggested restrictions nor provided with any information to give to her supervisors.  Instead, she alleges that immediately upon returning from the exam with Dr. Harris, her supervisor sent her to a medical unit where she was asked to transport a patient in a wheelchair.  Furthermore, she claims that after this limitation was put in place, she "was still consistently required to take patients to ECT or floated to medical units" and "assigned to do only physical tasks for patients."[3]

---

[1]  In fact, Dr. Harris stated that Enica was "barely able to push . . . 15 lbs."

[2] In support, the VA submitted an affidavit of McVey, wherein she states that the VA "modified Ms. Enica's job functions by excusing her from carrying or pushing more than 45 pounds."

[3] The district court did not consider the portion of Enica's affidavit which it found inconsistent with her deposition testimony.  Specifically, Enica stated during her deposition that

3. The EEO Claim and Additional Requests for Accommodation

On April 9, 1997, Enica filed a complaint with the EEOC alleging discrimination based on national origin and disability, and retaliation against her for initiating EEO counseling. The EEOC concluded that she had failed to establish her claims. The complaint did not address any requests for accommodation or indicate that she had been retaliated against for requesting the same.

In 2000, the VA decided to integrate all inpatient care services at the Jamaica Plain campus with the West Roxbury and Brockton campuses. Over the next two years, the VA negotiated with the labor unions to transfer employees from Jamaica Plain to either of the two other campuses. Enica learned about the impending transfer sometime in May of 2002, and requested to remain at the

---

she did not speak to management between 1996 and 2002 about her physical condition; however, she stated the opposite in her affidavit. As is settled, when an interested witness gives clear answers to unambiguous questions, she cannot create a question of fact by providing a contrary statement without any explanation of the change. See Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000). Notwithstanding, Enica further states in her affidavit that she was assigned to take patients to ECT and consistently floated to the medical floor. She also averred that she was trying "to get some fair treatment and to obtain reasonable work conditions." Accordingly, while Enica is bound by her deposition testimony indicating that she did not discuss her disability with management between 1996 and 2002, we accept as true, for the purpose of summary judgment, the portion of her affidavit claiming that throughout this time she was consistently assigned tasks that she could not perform.

Jamaica Plain campus in a mental health position. She was informed, however, that no positions were available.

Again concerned that her unit would close and she would be transferred to a more physically demanding position, Enica informed Farren that Enica had been experiencing knee and back pain and could not walk long distances. Based on the advice of a union representative, Enica saw Dr. Robert Provost to obtain additional documentation of her physical restrictions and limitations. In a note dated May 13, 2002, Dr. Provost recommended that Enica not be placed in a position that would require her to stand for more than five minutes at a time, or participate in either psychiatric crisis interventions or walking rounds. When Enica gave Farren the note, she claims that Farren became "very upset." Beginning in May of 2002, and continuing up until June of 2002, Enica engaged in an email dialogue with VA management regarding reasonable accommodations.

On June 28, 2002, Enica met with William Warfield ("Warfield"), Chief of Employee Relations, Karen Basset, Associate Director of Nursing and Patient Care, McVey, and Lisa Cargill, a union representative, concerning the closing of her unit at the Jamaica Plain campus. Enica was then informed that she was being transferred, along with ten other nurses, to a new crisis stabilization unit ("CSU") in West Roxbury. At this meeting, Enica again raised the issue of her disabilities and need for

accommodation. Specifically, she was concerned that the distance between buildings in the West Roxbury campus would require more walking than she could safely do.

As a result of the meeting, an agreement was reached to modify Enica's duties at the CSU. In particular, Enica would not be required to participate in the physical aspect of any crisis intervention, including "Code Greens."[4] In addition, and although not documented in writing, Enica claims that she was excused from doing anything that she could not do. According to the affidavit submitted by McVey, it was expected that because the CSU contained only three beds, the work would be less physically demanding and, therefore, more suitable for Enica.

Enica began working in the CSU on July 1, 2002. On her first day she was asked to complete walking rounds throughout the

---

[4] Specifically, the letter memorializing this meeting, dated June 28, 2002, states, in relevant part:

> After meeting with you, Mr. Warfield, and Ms. McVey, and discussing the scope of practice for a Registered Nurse in the Crisis Stabilization Unit at West Roxbury Campus . . . it was agreed that you would provide all functions with the following exceptions/modifications:
> 1.  You would not participate in the physical aspects of any crisis intervention, such as a response to a Code Green. This did not exclude you from responding, but limited your involvement to non-physical aspects of such a response.
> 2.  As indicated in the meeting I will ensure that Nursing management at West Roxbury division is aware of this.
>
> . . . .

entire hospital. Apparently, because her unit had only one or two patients per week, Enica and the other CSU nurses worked on the medical unit and participated regularly in walking rounds.[5] According to Enica, she tried not to participate in these rounds but "got pressure from my supervisors to participate." In addition, the nurses in that unit escorted agitated psychiatric patients housed on the inpatient units and provided "one on one" assistance and supervised confused or agitated patients on a rotating schedule every hour. This work entailed walking to different parts of the hospital, and the distances she was required to walk were longer than those in her previous position. Enica estimates that she walked between one and a half and two and a half miles per day while at the CSU. As a result, the pain in Enica's leg and back worsened, making it difficult for her to perform the walking rounds.[6]

As best as the court can discern, on or about August 9, 2002, Enica, through her attorney, contacted an EEO Specialist, Sharon O'Leary, complaining that the accommodation was not working and the excessive walking was causing increased pain and risking further disability.[7] Enica requested, among other things, that she

---

[5] Enica also participated in psychiatric team rounds conducted by the director of psychiatry three times a week.

[6] As a result, Enica took pain medication on a daily basis.

[7] It is unclear whether this letter was actually sent or delivered on August 9, 2002. Although the letter bears that date and Enica's interrogatory answers suggest as much, VA documents indicate that

be transferred to an outpatient unit and again be relieved from responding to any "Code Greens" or any task requiring long walks, such as conducting patient rounds and patient consults. A copy of this letter was also sent to Warfield, with whom she had met in June of 2002. On August 21, 2002, Enica contacted the Office of Resolution Management and spoke with EEO Counselor Gregory E. Jones, Sr. ("Jones"). She requested immediate relief from walking to patient consults and rounds and participating in "Code Greens" on foot. She also asked to be reassigned to the Outpatient Mental Health Clinic at West Roxbury. In an October 10, 2002, report, Jones noted his attempt to resolve the situation by communicating Enica's complaint to Warfield. After rejecting a number of Enica's proposed accommodations, Warfield agreed to provide her with a motorized scooter ("scooter") for use in her current job. Further, Warfield agreed that Enica would not be required to work more than she could manage until the scooter became available.

The record reflects that on September 9, 2002, the pain from walking became so great that Enica nearly fell. As a result, Enica was placed on paid administrative leave. While on leave, Dr. Provost diagnosed Enica with bursitis caused by excessive walking. In his report, he noted that Enica had developed pain in her left hip from trying to protect her right leg while walking. He

___

she did not seek to initiate EEO counseling until August 20 or 21 of 2002.

"strongly" recommended that she be transferred to an outpatient facility. Enica remained on leave until November 3, 2002.

During this time, Enica filed a worker's compensation claim. The Office of Workers' Compensation Programs District Office of the Department of Labor denied Enica's request for compensation because it found that her condition was not causally related to her job. Enica disagreed with the decision and requested an oral hearing in front of a hearing representative. The hearing representative rejected Enica's request, but conducted an investigation, ultimately finding that the excessive walking at work caused bursitis to develop in Enica's left hip, and concluding that she was entitled to worker's compensation benefits.

On September 19, 2002, informal counseling with respect to her complaint to the EEO counselor was terminated and Enica was provided a Notice of Right to File a Discrimination Complaint. A formal complaint was filed on October 1, 2002.

On November 4, 2002, Enica returned to work with the scooter. The scooter successfully addressed her walking problems, allowing her to do rounds and work with patients in different buildings. Shortly after returning to work, however, Enica was asked to perform tasks that she was physically unable to do.[8] When Enica objected, she was not required to perform the tasks. In her

---

[8]  On November 6, 2002, the person in charge of the medical unit ordered Enica to physically restrain a patient. Later, on December 19, 2002, she was asked to control a combative patient who was attempting to pull out his IV lines.

-11-

deposition, however, she testified that on one occasion she was disciplined for objecting.

As a result of Enica's inability to perform the requested tasks, the VA, pending the receipt of medical information, again placed Enica on paid administrative leave. Enica was on leave from December 30, 2002, until April 7, 2003.

When Enica returned to work, she was assigned to the primary care Telephone Advisory Program ("TAP") at the Jamaica Plain campus, the position that she currently holds. The TAP job entails communicating with patients, pharmacies, and primary care providers by telephone. No walking, lifting, bending, or carrying is required.

B.    **Clinical Nurse Specialist Opening (Title VII Claim)**

In December of 2002, Dr. Robert W. McCarley sought funding for a Nurse Practitioner position in the Outpatient Mental Health Clinic on the Jamaica Plain campus, and advertised the vacancy from February 14 to March 7, 2003. Although seven people applied, Dr. McCarley decided not to fill the position, choosing instead to recruit a Clinical Nurse Specialist. Enica did not apply for this position. The Clinical Nurse Specialist opening was posted from June 5 to June 26, 2003. Appellant and one other individual applied.

According to an affidavit submitted by Warfield, Dr. McCarley ultimately determined that it was more economical for the

VA to combine certain funds, save certain funds from VA's budget and hire a psychiatrist instead of a clinical nurse. The VA approved the request and around April of 2004 the position was filled by Dr. Harriet Scheft. Between 2004 and 2005, there was no communication between Enica and the VA regarding the position Enica had applied for. In November 2005, Enica learned that said position had been eliminated.

## II.  Standard of Review

A district court's grant of summary judgment is reviewed de novo, considering the facts in the light most favorable to the nonmoving party. See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 109 (1st Cir. 2006); Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145, 150 (1st Cir. 2006). Summary judgment is properly granted if the movant can demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Ingram v. Brink's Inc., 414 F. 3d 222, 228-29 (1st Cir. 2005); see also Freadman v. Metro. Prop. and Casualty Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007). In the summary judgment context, "genuine" has been construed to mean "that the evidence

-13-

about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992). Similarly, a fact is "material" if it is "one that might affect the outcome of the suit under the governing law." Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994) (internal citation and quotation marks omitted).

## III. Discussion

### A. Reasonable Accommodation

#### 1. Collateral Estoppel

First, Enica contends that the district court erred in refusing to apply the doctrine of offensive collateral estoppel to the question of whether the VA provided Enica with a reasonable accommodation. Since the application of the collateral estoppel doctrine primarily presents a question of law, the court affords de novo review. See Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 50 (1st Cir. 1997).

Collateral estoppel, also known as issue preclusion, prohibits a party from re-litigating issues that have previously been adjudicated. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327 n.5 (1979); In re Belmont Realty Corp., 11 F.3d 1092, 1097 (1st Cir. 1993); Rogers v. Town of Northborough, 188 F. Supp. 2d. 10, 13 (D. Mass. 2002). Collateral estoppel may be used defensively, to prevent a plaintiff from asserting a previously

-14-

litigated claim against the defendant, or offensively, to foreclose the defendant from re-litigating an issue that it previously lost. Parklane, 439 U.S. at 326 n.4. Offensive use of collateral estoppel, the form Enica seeks to invoke here, raises concerns of fairness to the VA. See Acevedo-García v. Monroig, 351 F.3d 547, 574 (1st Cir. 2003). As such, the determination of whether the doctrine applies is conditioned on "whether defendants received a full and fair opportunity to litigate their claims" in the first proceeding. Id. at 575. In this regard, Enica must establish (1) that the issue to be precluded is the same as that disputed in a prior proceeding, (2) that the issue was actually litigated in the earlier proceeding, (3) that the issue was determined by a valid and binding final judgment or order, and (4) that the determination of the issue in the prior proceeding was essential to the final judgment or order. Id.; Plumley, 303 F.3d at 373; Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999). As the district court correctly concluded, Enica's proffer cannot clear the first of these hurdles.

With respect to the first element, identity of issues, "[i]t is common ground that the reach of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects to that decided in the first proceeding.'" Faigin, 184 F.3d at 78 (quoting C.I.R. v. Sunnen, 333 U.S. 591, 599-600 (1948)). It is undisputed that the issue addressed and resolved by the Department of Labor was whether

-15-

Enica's injuries (bursitis) were caused by excessive walking in the course of her employment at the VA. By contrast, the issue before the district court was whether the VA failed to provide Enica with reasonable accommodations in connection with her disability. This determination involves, among other considerations, the VA's knowledge of her physical limitations (as they evolved over time) and the feasibility of accommodations and interactive process between the parties. In other words, although factually related, the issue of whether the VA failed to provide her with reasonable accommodations under the Rehabilitation Act was not essential to, much less addressed, by the Department of Labor's finding that excessive walking at the workplace contributed to her injuries.[9] See id. ("[T]he mere presence of a modicum of factual commonality does not establish the requisite identity of issues for purposes of collateral estoppel."); compare Plumley, 303 F.3d at 373 (collateral estoppel as to Family and Medical Leave Act eligibility did not apply to arbitration proceeding where issue was neither determined or essential), with Bath Iron Works Corp. v. U.S. Dep't of Labor, 125 F.3d 18, 22 (1st Cir. 1997) (applying collateral estoppel to state administrative decision that claimant's injuries had no lasting effect on his condition).

---

[9] It bears mention that the factual determination of the Department of Labor—that Enica's injuries were caused by excessive walking—appears largely undisputed in this case. As such, we do not reach the issue of whether said finding would be binding in the instant action.

-16-

Accordingly, being unable to conclude that the same issues were considered in the previous administrative proceeding, we conclude that collateral estoppel is inapplicable to the instant action.

2.   Failure to Accommodate

Next, Enica challenges the district court's determination that she failed to establish a prima facie case of failure to accommodate under section 504 of the Rehabilitation Act, 29 U.S.C. § 794.[10]

In addition to prohibiting disparate treatment of individuals with disabilities, the Rehabilitation Act and Americans with Disabilities Act ("ADA") "impose an affirmative duty on employers to offer a reasonable accommodation to a disabled employee." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19-20 (1st Cir. 2004)[11]; see also 42 U.S.C. § 12112(b)(5)(A); García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 n.9 (1st Cir. 2000) ("[T]he ADA does more than prohibit disparate treatment. It also imposes an affirmative obligation to provide reasonable accommodation to disabled employees.").

---

[10]   Enica also alleged a claim under section 501 of the Rehabilitation Act.  29 U.S.C. §791(b).  The district court granted the VA's cross-motion for summary judgment with respect to this claim, finding that Enica failed to offer any evidence to support it.  Enica does not appeal this determination.

[11] As a federal employee, Enica is covered under the Rehabilitation Act and not the ADA.  Nevertheless, since the same standards apply to both the Rehabilitation Act and ADA, we rely on precedent construing both statutes.  See Calero-Cerezo, 355 F.3d at 12 n.1.

-17-

In order to assert a claim for failure to accommodate under the Rehabilitation Act, Enica must establsh that she (1) suffers from a "disability" within the meaning of the statute, (2) is a qualified individual inasmuch as she is able to perform the essential functions of her job, with or without reasonable accommodation, and (3) that, despite its knowledge of her disability, the VA did not offer a reasonable accommodation. See Calero-Cerezo, 355 F.3d at 20. The VA concedes that Enica satisfies the first two requirements, but argues that she does not meet the third element inasmuch as she failed to establish that the VA failed to provide her with reasonable accommodations.

In determining whether an employer has failed to provide a reasonable accommodation, we follow the two-step analysis outlined in Reed v. LePage Bakeries, Inc., 244 F.3d 254 (1st Cir. 2001). See Calero-Cerezo, 355 F.3d at 23. First, the employee must show "not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." Reed, 244 F.3d at 259. Second, the employee must prove that the request was sufficiently direct and specific so as to put the employer on notice of the need for an accommodation. Id. at 261; see also Wynne v. Tufts Univ., 976 F.2d 791, 795 (1st Cir. 1992).

Once the plaintiff satisfies these two elements, "the

defendant may attempt to prove that, in fact, the proposed accommodation was not feasible and would constitute an 'undue' hardship." Calero-Cerezo, 355 F.3d at 23 (citing Reed, 244 F.3d at 261). This "requires the employer to produce at least some modicum of evidence showing that the [requested accommodation] would be a hardship, financial or otherwise." Id. (quoting Ward v. Mass. Health Research Inst. Inc., 209 F.3d 29, 37 (1st Cir. 2000)).

In some cases, an employee's request for an accommodation may trigger a duty on the part of the employer to engage in an interactive process. See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005); Calero-Cerezo, 355 F.3d at 23; Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001); Reed, 244 F.3d at 262 n. 11. As part of this process, the employer is "expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability." Tobin, 433 F.3d at 108. Although the degree of interaction required varies in accordance to the circumstances of each case, the process requires open communication by both parties, and an employer will not be held liable if it makes "reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed . . . ." Phelps, 251 F.3d at 28 (quoting Beck v. Univ. of Wis. Bd. Of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996)); see also Tobin, 433 F.3d at 109 (recognizing that the standard governing the interactive process is less than clear);

-19-

Calero-Cerezo, 355 F.3d at 24.[12]  Where a breakdown in the process has been identified, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary."  Beck, 75 F.3d at 1135.  For instance, "[a] party that obstructs or delays the interactive process is not acting in good faith."  Id.

Though the issue of good faith is relevant in examining the interactive process, a showing of discriminatory intent or animus is not required in cases alleging a failure to accommodate. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999).  Instead, "an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodation would create undue hardship for its business."  Id. (citing 42 U.S.C. § 12112(b)(5)(A)).  Furthermore, the "duty to provide a reasonable accommodation is a continuing one, however, and not exhausted by one effort."  Ralph v. Lucent Tech., Inc., 135 F.3d 166, 172 (1st Cir. 1998).

Enica's primary argument seems to be that because the VA

---

[12] 29 C.F.R. § 1630.2(o)(3) provides, in relevant part, that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual . . . .  This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome these limitations."

has been aware of her condition since 1996, there exists a question of fact as to whether or not her immediate supervisors knew about her condition, and acted to protect her.[13]  Simply stated, Enica argues that her injuries were so obvious that this triggered a continuing obligation on the part of the VA to provide her with necessary accommodations.  See, e.g., Reed, 244 F.3d at 261 n.7.

In Reed, we stated that "sometimes the employee's need for an accommodation will be obvious; and in such cases, different rules may apply."  Id.  In that context, we were addressing situations where the nature of the disability and accommodation required are so obvious that "there may be little or no need for discussion" with the employee.  EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Notice 915.002 (October 17, 2002), available at http://www.eeoc.gov/policy/docs/accommodation.html. To the extent an employer might successfully provide an accommodation with little interaction with the employee, such a situation does not present itself here.  Although Enica's disability was obvious, the record makes clear that her condition and duties at work required different accommodations at different times.  Indeed, her doctor recognized as early as 1996 that "it was not possible to spell out restrictions for all circumstances" and

---

[13] For example, Enica walked with a limp, had a handicapped sticker on her car, parked in a handicapped spot, had asked for special accommodations previously, and had medical notes on file recommending that her physical activities be limited.

-21-

that she "must be permitted some discretion."  More specifically, in 1996 her limitations involved pushing or pulling patients and did not appear to include excessive walking.  As time went on and the nature of her duties and condition changed, it became clear that Enica could not engage in excessive walking without it causing an inordinate amount of pain or worsening of her condition.  As such, we do not view this to be a case where a disability is so obvious that an employer would be required to provide a particular accommodation.

Having found that the VA was not required to provide an accommodation on its own accord based on an obvious disability, Appellant's specific requests for accommodations may be grouped into two distinct time periods; namely, her 1996 request for accommodations relating to the pushing and pulling of patients and her 2002 request for accommodation not to engage in excessive walking.

### a.   1996 Requests for Accommodation

In her affidavit, Enica alleges that despite the restrictions imposed in 1996, she was continually required to take patients to ECT or to float to medical units where she was assigned to perform physical tasks.  Although the record supports these allegations, nowhere does it appear that she complained to her supervisors.  Rather, it appears that Enica continued performing

-22-

her duties up until 2002, without incident or objection.[14] As such, we agree with the district court that absent any communications from Enica regarding the inadequacy of her accommodations, no factfinder could hold the VA responsible for either a breakdown in the interactive process or failing to correct an inadequate accommodation since it was not made aware that a deficiency existed.

### b. 2002 Requests for Accommodation

In 2002, however, as the district court pointed out, Enica made a number of separate, albeit similar, requests for accommodation. Enica's first request came in May of 2002, when she informed her supervisor that she was experiencing knee and back pain and could not walk long distances. To support her request, she underwent a medical evaluation and submitted an evaluation from Dr. Provost which recommended, inter alia, that Enica not be placed in a position that would require her to participate in psychiatric crisis interventions, or in walking rounds.[15] Based upon the forgoing, Enica engaged in an email dialogue with VA management regarding reasonable accommodations to address this limitation.

---

[14] Enica highlights that there may be situations where an employee feels too intimidated to object to an employer's refusal to accommodate. See Freadman, 484 F.3d at 105. Though we agree that such situations occur, there is no evidence that such a situation occurred here.

[15] Dr. Provost further stated that "with the passage of time, it is possible that her disability may increase," and that he did not expect Enica to make a full or partial recovery from her disability.

Enica's second request occurred during a June 28, 2002, meeting with her supervisors. In said meeting, Enica again raised the issue of her disabilities and need for accommodation. Specifically, she expressed concern that the distance between buildings in the West Roxbury campus would require more walking than she could safely do. As a result of the meeting, an agreement was reached whereby Enica's duties at the CSU were modified. In particular, the agreement memorialized that Enica would not be required to participate in the physical aspect of any crisis intervention, including "Code Greens." Further, Enica avers that she was excused from taking part in anything that she could not do.

Shortly after reaching this agreement, on July 1, 2002, Enica was transferred to, and began working at, the CSU. On the day she started, she was informed that she, along with the other CSU nurses, were required to complete walking rounds in other medical units. That decision was given even though Enica had previously provided a medical certificate from Dr. Provost specifically stating that she should not take part in walking rounds. Moreover, she was required to participate in psychiatric team rounds three times a week. When she requested that she be relieved from participating in the walking rounds, as her agreement allowed her to do, Enica asserts that she was pressured by her supervisors to complete them. According to Enica, she walked between one and a half and two and a half miles a day. As a

result, the pain in her leg and back worsened, causing her to take pain medication on a daily basis to alleviate the pain.

As a result of the above, Enica sent a letter to an EEO specialist, dated August 9, 2002, complaining that the accommodation was not working, and that the excessive walking was causing increased pain and placing her at risk for further disability. Said letter was copied to Warfield. Enica requested, inter alia, that she be transferred to an outpatient unit and again be relieved from responding to "Code Greens" or any task requiring long walks, such as conducting patient rounds and patient consults.

On August 21, 2002, Enica again contacted the EEO office complaining of discrimination, and requested that she be transferred to an outpatient unit and be relieved from responding to "Code Greens" or any task requiring long walks.[16] As part of his investigation, and in an attempt to resolve the situation, Jones, the EEO counselor addressing Enica's complaint, conducted an interview with Warfield on September 6, 2002, and conveyed to him Enica's complaints. Sometime subsequent to the interview, and after rejecting some of Enica's requests, Warfield agreed to provide Enica with a scooter for use on the job. Furthermore, he agreed that Enica would not be required to walk more than she could manage until such time as the scooter became available.

On September 9, 2002, Enica was placed on paid

---

[16] The contents of Enica's complaint were memorialized in an October 10, 2002 report, created by EEO counselor Jones.

-25-

administrative leave because she was complaining of extreme pain. While on leave, plaintiff returned to Dr. Provost, who diagnosed her with bursitis caused by excessive walking. Dr. Provost also "strongly" recommended that Enica be transferred to an outpatient facility to "eliminate the repetitive stress to the advanced arthritic changes in her right lower extremities."[17]

Enica returned to work on November 4, 2002, and was provided with the scooter. The scooter addressed her walking problems, allowing her to do rounds and work with patients in different buildings. Shortly after returning, however, Enica was once again asked to perform tasks that she was physically incapable of doing, and in direct contravention of her submitted medical certificates.[18] For example, on November 6, 2002, Enica was ordered to physically restrain a patient. Later, on December 19, 2002, she was asked to control a combative patient who was attempting to pull out his IV lines. When Enica objected, she was not required to

---

[17] On September 19, 2002, informal counseling with respect to her complaint to the EEO counselor was terminated and Enica was provided a Notice of Right to File a Discrimination Complaint. A formal complaint was filed on October 1, 2002.

[18] As previously discussed, in May of 1996, Enica saw Dr. Wright, who recommended that she avoid repetitive low back activity, repetitive or heavy pushing and pulling, and indicated that she was not suited for medical or surgical floor assignments. On July of 1996, Enica submitted a medical certification from Dr. Harris clearly stating that she could not lift, carry, or push forty-five pounds. Moreover, during the June 28, 2002, meeting between Enica and her supervisors, it was specifically agreed that Enica would not have to participate in the physical aspect of any crisis intervention.

perform the tasks.[19]  Again, as a result of Enica's inability to perform the requested tasks, the VA placed her on paid administrative leave from December 30, 2002, until April 7, 2003.[20]

Based on the foregoing, we find that, while it is an extremely close question, a triable issue of fact exists as to whether the VA provided Enica with reasonable accommodations. While the VA certainly took part in the interactive process and made some effort to work with Enica, as the district court correctly pointed out, it is less than clear that it provided Enica with reasonable accommodations. See Tobin, 433 F.3d at 108 n.7 (finding that it is "possible for an employer to satisfy its duty to engage in 'interactive process' yet still fail to provide 'reasonable accommodation' to a disabled employee").

The VA, for its part, argues that it was never required to provide Enica with the accommodation of her choice, but rather required to engage in a good faith interactive process in finding her a reasonable accommodation. See Phelps, 251 F.3d at 27-28. Though the VA correctly states that an employer is neither required to provide an employee with an accommodation of her choice nor to create a new position for that employee, we note that once an

---

[19]  Enica did testify, however, that on one occasion she was disciplined for objecting.

[20]  Upon her April 7, 2003, return, Enica was assigned to the TAP at the Jamaica Plain campus.  The TAP position entails communicating with patients, pharmacies, and primary care providers by telephone.  No walking, lifting, bending, or carrying is required.

employer agrees to provide a particular accommodation, it must act reasonably in implementing said accommodation.  See id.; Calero-Cerezo, 355 F.3d at 25.

Moreover, aside from the VA's delayed response to her complaints about the inadequacy of the accommodation, there is evidence that the VA neglected to take substantive action in implementing the accommodations in the first instance.  In particular, the evidence supports a finding that an agreement was reached on June 28, 2002, at least in principle, that the upcoming transfer to the CSU would not require Enica to walk long distances or otherwise perform any tasks she could not physically do.[21] Despite this agreement, on July 1, 2002, three days after the meeting and the first day she reported to CSU, Enica was required to engage in walking rounds throughout the hospital and in spite of her objections, she allegedly received pressure from her supervisors to do so.

The VA submits that it made the decision to transfer Enica to the CSU based on the belief that working in a small unit

---

[21] The memorandum memorializing the meeting between Enica and modifications to be implemented did not indicate that she would be exempt from performing walking rounds.  Indeed, the list of duties provided explicitly states that Enica would "[m]ake rounds of the psychiatric patients housed on the medical units, when time allows."  Nevertheless, in her deposition, Enica testified that McVey and Warfield also told her that she would not have to walk excessively, or do anything that she could not physically do. Moreover, the May 13, 2002, medical certification from Dr. Provost clearly recommended Enica not be placed in a position requiring her to participate in walking rounds.

-28-

with only three beds would be less physically demanding than her current position. Elsewhere in the record, however, the VA concedes that because the CSU saw only one or two patients a week, it would ask its nurses, including Enica, to perform walking rounds in other medical units. This admission, the physical distance separating the units and fact that Enica was required to engage in walking rounds on the first day she reported for duty, combine to cast into doubt whether the VA made any effort, or had any intention, to implement the accommodation to which they had agreed a few days prior. See Higgins, 194 F.3d at 265. Moreover, even after the VA provided Enica with a scooter to address her walking problems, her supervisors still asked her to perform physical tasks that were beyond her clearly stated, and throughly documented, capabilities. See Ralph, 135 F.3d at 172 ("The duty to provide reasonable accommodation is a continuing one . . . and not exhausted by one effort.").

In sum, evidence exists from which a reasonable factfinder could conclude that, despite her repeated requests for accommodations during the several months before and after her transfer in July of 2002, the VA violated the Rehabilitation Act in failing fully to implement the accommodations it had agreed to or provide a reasonable response once it became clear that the provided accommodations were insufficient.[22]

---

[22] Although a factfinder may conclude that the VA acted and responded appropriately with respect to accommodating Enica's

**B.    Retaliation Claim**

To prove a retaliation claim under Title VII, a plaintiff must show that: "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action."  Calero-Cerezo, 355 F.3d at 25 (citing Gu v. Boston Police Dep't., 312 F.3d 6, 14 (1st Cir. 2002)).  Once the plaintiff establishes a prima facie showing of retaliation, the McDonnell Douglas burden-shifting approach applies.  See id. at 26. Under this framework, the defendant must articulate a legitimate, non-retaliatory reason for its employment decision.  Id. If the defendant does so, the burden shifts to the plaintiff to show that "the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Id.

The district court found that although Enica engaged in protected activity, she nonetheless failed to establish the existence of an adverse employment action.  In her appeal, Enica argues that the district court failed to consider the circumstantial evidence supporting a finding that she was improperly denied a promotion based upon her engaging in protected

condition, sufficient evidence exists in the record at this time to withstand summary judgment.

activity.[23]     Although circumstantial evidence may certainly establish discriminatory motive, see E.C. Waste, Inc. v. N.L.R.B., 359 F.3d 36, 42 (1st Cir. 2004), Enica fails to point to any evidence to support such an inference.  All she claims is that the district court improperly relied upon the purportedly inadmissible hearsay affidavit of Warfield, stating that the nursing position Enica applied for was never filled but instead eliminated, because it was deemed more cost effective to hire a psychiatrist instead.

Even assuming, arguendo, that it was error to rely on Warfield's affidavit, Enica does not point to—nor can we find—any direct or circumstantial evidence indicating that the VA's failure to award her the position that she applied for was done in retaliation for engaging in protected activity.  See Conto v. Concord Hosp., Inc., 265 F.3d 79, 81 (1st Cir. 2001) (noting that the Federal Rules of Appellate procedure require that appellants, rather than the court, ferret out and articulate the record evidence considered material on appeal).

## IV.  Conclusion

Although Enica failed to present sufficient evidence to meet her burden of establishing that the VA failed to accommodate

---

[23] Before the district court, Enica also identified the failure to accommodate her disability and the existence of a hostile work environment as identifiable adverse employment actions.  Although she does not raise this argument on appeal, we nonetheless fail to find support for either theory here.  Though Enica testified in her deposition that she was once disciplined for not performing a task which she could and would not perform, this general averment is insufficient to survive summary judgment.

her disability in 1996 or retaliated against her for engaging in protected activity under the Rehabilitation Act, we find that there is sufficient evidence on record to establish a triable issue as to whether the VA failed to implement the accommodation requests at the time of Enica's transfer to the CSU in 2002. Accordingly, the trial court's judgment is affirmed in part and vacated in part. Each side shall bear their own costs.