# United States Court of Appeals
## For the First Circuit

No. 11-1339

MARTIN FIELD,

Plaintiff,

MAURA FIELD, Administratrix of the
Estate of Martin T. Field, II,

Plaintiff, Appellant,

v.

JANET NAPOLITANO, Secretary,
Department of Homeland Security,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Mitchell J. Notis, with whom the Law Office of Mitchell
J. Notis was on brief, for appellant.
Christine J. Wichers, Assistant United States Attorney,
with whom Carmen M. Ortiz, United States Attorney, and Jennifer A.
Serafyn, Assistant United States Attorney, were on brief, for
appellee.

November 10, 2011

**LYNCH**, **Chief Judge**.  This is a case of first impression for this court as to airport security screeners and the relationship between the Aviation and Transportation Security Act (ATSA), Pub. L. No. 107-71, 115 Stat. 597 (2001) (codified in scattered sections of 49 U.S.C.), and the Rehabilitation Act, 29 U.S.C. § 791 et seq.

Maura Field, administratrix of the estate of her late husband Martin Field, appeals from the district court's dismissal of her suit alleging that the Transportation Security Administration (TSA) discriminated and retaliated against Martin Field ("Field") on the basis of a disability in violation of the Rehabilitation Act.  TSA determined that Field, who developed a diabetic ulcer on the bottom of his foot in 2006, was unable to perform even his adjusted job requirements as a TSA security screener at Boston's Logan International Airport because he could not stand for long periods of time and experienced difficulty walking.  After Field missed several months of work, TSA terminated Field's employment on November 27, 2006, two years after it had hired him.

Field[1] brought suit in federal court in Massachusetts, alleging discrimination and retaliation under the Rehabilitation Act, after exhausting administrative remedies.  The district court

---

[1]    Field died on April 2, 2010, shortly after this suit was filed.  On April 22, 2010, Mrs. Field was appointed administratrix of Field's estate.

dismissed both claims because it concluded that the ATSA precludes a cause of action under the Rehabilitation Act. Field v. Napolitano, No. 10-10385 (D. Mass. Mar. 3, 2011). We affirm.

                                 I.

The facts, as alleged in the complaint, are as follows.

On November 28, 2004, Mr. Field began working for TSA as an airport security screener at Logan International Airport in Boston, Massachusetts. TSA security screeners are primarily responsible for screening people and property at TSA security checkpoints in federal airports. Screeners are expected to meet several conditions of employment, including the ability to walk up to two miles during a shift and stand for prolonged periods of time. Screeners are also required to handle, lift, and carry baggage weighing up to seventy pounds.

Field suffered from diabetes and several related medical conditions, including recurring diabetic ulcers on the bottom of his feet. These diabetic ulcers required Field to wear an air cast and to remain off his feet for extended periods of time.

In April 2006, Field was approved for restricted duty "to limit the time that he had to stand while he was working" due to a diabetic ulcer. He "reported to work on most days, but on occasion called in sick because he was unable to walk due to the diabetic ulcer on his foot." In June 2006, Field's leg became infected and

he took approximately six weeks of leave under the Family Medical Leave Act.

On July 27, 2006, Field faxed a doctor's note to TSA management official George Barris stating that Field was able to return to work "with [the] restriction of getting off of his foot to a sitting position as he feels a need during his shift." Field alleges that he also called and faxed Barris several times over the following week, but received no response.

On August 4, 2006, Field reported for work. He was given certain forms to be completed by his doctor. Field immediately went to his doctor's office, where his doctor completed and faxed the forms to TSA Manager Tom Brady. That afternoon, Brady allegedly informed Field that TSA management "considered Mr. Field to be too much of a liability to return to work at that time." Field did not return to work.

From August 4 to October 23, 2006, Field called in sick nearly every day "so that he would not be terminated for not showing up for work." In the meantime, Field applied for unemployment benefits. Field stopped calling in sick on October 24, 2006, the day that he began to receive unemployment benefits.

On October 18, 2006, Barris sent Field a memorandum stating:

> [B]ecause of your extended illness or absence, which has not been supported, you are requested to furnish medical evidence which includes a diagnosis and prognosis by October

> 25, 2006, to cover your absence. . . . If absence is due to a cause other than your personal illness, you are required to submit evidence to justify the reason for your absence. . . . Should you fail to provide acceptable evidence for your current absence by October 25, 2006, . . . your absence will be charged to absence without official leave (AWOL), and necessary corrective action, up to and including removal from the TSA, will be initiated.

(alterations in original complaint). Field responded to Barris that he had reported for work with restrictions in August and had been informed that he would not be allowed to return to work. On October 26, Brady sent Field a further request for medical information, stating: "Our records indicate that you continue to call the sick line and to date we have not received any documentation which would authorize you to return to full duty without any restrictions." Field did not respond to this request.

On November 27, 2006, TSA terminated Field's employment, citing excessive absence without leave and failure to follow instructions.

After exhausting administrative remedies, Field brought suit in March 2010, alleging both discrimination on the basis of his diabetes and retaliation as a result of engaging in protected EEO activity. The TSA moved to dismiss both claims on the basis that the Aviation and Transportation Act (ATSA) exempts the TSA from compliance with the Rehabilitation Act and so provides no private cause of action to Field for either theory.

The district court granted the TSA's motion to dismiss as to both claims. Field, No. 10-10385, slip op. at 2. As to the discrimination claim, the district court reasoned that the ATSA authorizes the TSA to set standards of employment for security screeners such as Field "[n]otwithstanding any other provision of law," and that this "notwithstanding" language signals that the ATSA overrides any conflicting provisions of the Rehabilitation Act. Id. at 1-2. The district court noted that the Seventh and Eleventh Circuits have also "held explicitly that the ATSA preempts the Rehabilitation Act." Id. at 2. Because the plaintiff had no cause of action under the Rehabilitation Act, the retaliation claim also failed. Id.

## II.

We review de novo the grant of a motion to dismiss under Rule 12(b)(6), accepting "as true all well-pleaded facts and making all reasonable inferences in favor of the plaintiff." Massachusetts v. Sebelius, 638 F.3d 24, 29 (1st Cir. 2011). This issue is one of pure law, reviewed de novo. See Dickow v. United States, 654 F.3d 144, 148 (1st Cir. 2011).

A.      The Aviation and Transportation Security Act (ATSA)

Congress enacted the ATSA immediately after the terrorist attacks of September 11, 2001. Congress sought "to improve aviation security" by effecting "fundamental change in the way [the United States] approaches the task of ensuring the safety and

-6-

security of the civil air transportation system." H.R. Rep. No. 107-296, at 1, 49 (2001) (Conf. Rep.). To that end, Congress created a new agency, the TSA, with sweeping responsibility for airport security screening, including setting the qualifications, conditions, and standards of employment for airport security screeners. 49 U.S.C. § 114.

Congress vested the TSA Administrator[2] with the authority to carry out the provisions of the ATSA. Id. § 114(d)-(f).[3] Congress placed particular emphasis on the Administrator's singular "responsib[ility] for day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation," directing that "[t]he Under Secretary shall . . . develop standards for the hiring and retention of security screening personnel." Id. § 114(e).

---

[2] Although the ATSA refers to the "Under Secretary of Transportation for Security" as the head of the TSA, the position has since been given the title "Administrator of the Transportation Security Administration." 49 C.F.R. § 1500.3. Originally, the ATSA was placed within the Department of Transportation. See 49 U.S.C. § 114(a). TSA has since been moved to the Department of Homeland Security. See 6 U.S.C. § 203(2).

[3] The ATSA also directs the TSA Administrator, in carrying out the provisions of the statute, to "work in conjunction with" other transportation agencies, particularly the Federal Aviation Administration and the International Civil Aviation Organization. 49 U.S.C. § 114(f)(13)-(14), (g). Further, the ATSA states that "[i]n taking any action under this section that could affect safety, the Under Secretary shall give great weight to the timely views of the National Transportation Safety Board." Id. § 114(i).

Congress "recognize[d] that, in order to ensure that Federal screeners are able to provide the best security possible, the Secretary must be given wide latitude to determine the terms of employment of screeners." H.R. Rep. No. 107-296, at 57.

This led Congress to enact a very specific provision, ATSA § 111(d), which provides:

> <u>Notwithstanding any other provision of law</u>, the Under Secretary of Transportation for Security may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions [required by the Act].

ATSA § 111(d), 115 Stat. at 620 (emphasis added) (49 U.S.C. § 44935 (historical and revision notes)).

Congress regarded screeners as so fundamental to aviation security that it outlined detailed minimum qualifications for the job in a provision containing a second "notwithstanding" clause. Section 44935(e)(2)(A), entitled "Qualifications [for Security Screeners]," states: "the Under Secretary shall establish qualification standards for individuals to be hired by the United States as security screening personnel. <u>Notwithstanding any provision of law</u>, those standards shall require, at a minimum, an individual" to meet several specific qualifications. 49 U.S.C. § 44935(e)(2)(A) (emphasis added). For example, security screeners must receive "a satisfactory or better score on a Federal security

screening personnel selection examination" and must "demonstrate daily a fitness for duty without any impairment due to illegal drugs, sleep deprivation, medication, or alcohol." Id. § 44935(e)(2)(A)(i), (e)(2)(A)(v).

Most pertinently, the enumerated qualifications include detailed physical requirements. Section 44935(e)(2)(A)(iii) provides that security screeners must "meet, at a minimum, the requirements set forth in [§ 44935](f)." Section 44935(f), in turn, contains a third "notwithstanding" clause which sets forth the following physical requirements:

> Notwithstanding any provision of law, an individual may not be deployed as a security screener unless that individual . . . shall possess basic aptitudes and physical abilities, including color perception, visual and aural acuity, physical coordination, and motor skills, to the following standards:
> . . . .
> Screeners performing physical searches or other related operations shall be able to efficiently and thoroughly manipulate and handle such baggage, containers, and other objects subject to security processing.
> . . . .
> Screeners who perform pat-downs or hand-held metal detector searches of individuals shall have sufficient dexterity and capability to thoroughly conduct those procedures over an individual's entire body.

Id. § 44935(f)(1) (emphasis added). This section lists several additional physical requirements, including the ability to

-9-

distinguish between colors, hear alarm sounds, and respond in spoken voice. Id.[4]

Section 44935(e)(2)(A), the "Qualifications" section, also requires that "at a minimum [a security screener must] meet such other qualifications as the Under Secretary may establish." Id. § 44935(e)(2)(A). Using this authority, TSA has established that all security screeners must be able to handle, lift, and carry baggage weighing up to seventy pounds. Yeager v. Chertoff, No. CV06-00740, 2006 WL 4673439, at *1-2 (W.D. Wash. Nov. 13, 2006); see also TSA Transportation Security Officer Conditions of Employment, http://www.tsa.gov/join/benefits/soar/tsa/tso_trainee. shtm (last visited Nov. 8, 2011). TSA has explained that a security screener who is "medically restricted from lifting or carrying baggage weighing up to 70 pounds is not qualified to perform the essential function of performing security screening of property and baggage at our nation's airports. It would be unsafe to the person, to the traveling public, and to other employees to put a person with such a medical restriction in this position." Declaration of Elizabeth B. Kolmstetter, Deputy Assistant

---

[4] Section 44935(f) also includes several specific non-physical requirements, such as the ability to "read, speak, and write English well enough to . . . read English language identification media, credentials, airline tickets, and labels . . . ; provide direction to and understand and answer questions from English-speaking individuals undergoing screening; and write incident reports and statements and log entries into security records." 49 U.S.C. § 44935(f)(1)(C).

Administrator, Office of Human Capital, Transportation Security Administration, Yeager, 2006 WL 4673439.[5]

The ATSA also mandates an annual evaluation of each security screener to ensure continued qualification for the job. 49 U.S.C. § 44935(f)(5). The statute states that "[a]n individual employed as a security screener may not continue to be employed in that capacity unless the evaluation demonstrates that the individual . . . continues to meet all qualifications and standards required to perform a screening function, . . . [and] demonstrates the . . . skills necessary to . . . effectively perform [such] screening functions." Id. § 44935(f)(5).

Finally, the statute provides that the "Under Secretary shall also review, and revise as necessary, any standard, rule, or regulation governing the employment of individuals as security screening personnel." Id. § 44935(e)(3).

B.        TSA Exemption from Suit Under the Rehabilitation Act

The question before us is whether the ATSA precludes a security screener, Field, from bringing suit under the federal

---

[5]    The lifting requirements are deemed necessary for all security screening personnel, including supervisors, because "[t]he public safety and extraordinary task facing TSA demands that the entire security screening workforce have the capacity to be deployed wherever needed at our nation's airports." Declaration of Elizabeth B. Kolmstetter, Deputy Assistant Administrator, Office of Human Capital, Transportation Security Administration, Yeager v. Chertoff, No. CV06-00740, 2006 WL 4673439 (W.D. Wash. Nov. 13, 2006).

Rehabilitation Act,[6] 29 U.S.C. § 791 et seq. We conclude that it does.

The TSA takes the position that the ATSA excludes security screeners from filing suit in federal court under certain of the federal employment statutes incorporated under Title 5 of the United States Code, including the Age Discrimination in Employment Act, the Fair Labor Standards Act, and the Rehabilitation Act. While consistently taking the position that suit cannot be brought under any of these Acts as to security screeners, the TSA Administrator has, within the TSA itself through Management Directives, provided certain corollary limited protections, which include some whistleblower protections and certain procedures for preventing and responding to sexual harassment. See TSA Management Directive No. 1100.75-5 (May 21, 2009) ("Whistleblower Protections for Transportation Security Officers"); TSA Management Directive No. 1100.73-3 (Jan. 6, 2009)

---

[6] The Americans with Disabilities Act (ADA) excludes "United States" from the definition of employer. See 42 U.S.C. § 12111(5)(B) ("The term 'employer' does not include . . . the United States . . . ."). "Based on this exclusion, federal courts have concluded that the ADA provides no remedy to federal employees." Daniels v. Chertoff, No. CV 06-2891, 2007 WL 1140401, at *2 (D. Ariz. Apr. 17, 2007); see also Enica v. Principi, 544 F.3d 328, 338 n.11 (1st Cir. 2008) ("As a federal employee, [plaintiff] is covered under the Rehabilitation Act and not the ADA."); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 11 n.1 (1st Cir. 2004) (stating that the opinion would concentrate on the Rehabilitation Act, "since the ADA is not available to federal employees").

("Prevention and Elimination of Sexual Harassment in the Workplace").[7]

As to the Rehabilitation Act, the TSA Administrator has issued a Management Directive providing that employees may request a reasonable accommodation but that employees who fail to meet the statutory requirements for the security screener position are not eligible for such accommodations. See TSA Management Directive No. 1100.73-4 (Jan. 25, 2006) ("Reasonable Accommodation Program"). Pursuant to his statutory authority, the TSA Administrator has declined to fully extend the Rehabilitation Act standards to security screeners because, inter alia, the Rehabilitation Act standards are not consistent with the physical qualifications that the TSA Administrator has established for the screener position.

The plain language of the ATSA supports the TSA position. "It is well established that, when the statutory language is plain, we must enforce it according to its terms." Jimenez v. Quarterman, 555 U.S. 113, 118 (2009). The ATSA provides that the TSA Administrator may establish and enforce employment qualifications for security screeners "[n]otwithstanding any other provision of law." 49 U.S.C. § 44935 (historical and revision notes).

"[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the

---

[7] TSA Management Directives are available at http://www.tsa.gov/research/foia/foia_directives.shtm (last visited Nov. 8, 2011).

'notwithstanding' section override conflicting provisions of any other section." Cisneros v. Alpine Ridge Grp., 508 U.S. 10, 18 (1993). As Cisneros observed, "[a] clearer statement is difficult to imagine." Id. (alteration in original) (quoting Liberty Mar. Corp. v. United States, 928 F.2d 413, 416 (D.C. Cir. 1991)) (internal quotation marks omitted). The law of this circuit follows Cisneros. See United States v. Hyde, 497 F.3d 103, 108 (1st Cir. 2007) (citing Cisneros for the holding that the language "[n]otwithstanding any other Federal law" in the Mandatory Victims Restitution Act is an "unambiguous" indication that the statute overrides conflicting provisions in the federal Bankruptcy Code).

Moreover, the ATSA enumerates specific physical qualifications for screeners, requires that screeners meet any such other physical qualifications as the TSA Administrator may establish, and requires the TSA to conduct annual evaluations to ensure conformity with such qualifications. 49 U.S.C. § 44935(e)-(f). Thus, under the ATSA, TSA cannot retain as security screeners individuals who are physically incapable of distinguishing between colors, hearing alarms, handling up to 70 pounds of baggage, or conducting a full-body pat-down. See id.

Allowing security screeners to bring suit under the Rehabilitation Act would be inconsistent with these statutory mandates in several respects. First, these specific ATSA requirements as to security screeners and the assignment of

-14-

qualifications to the TSA Administrator displace the broader and more general standards of the Rehabilitation Act. Compare 49 U.S.C. § 44935(e)-(f), with 29 U.S.C. § 794. Second, these provisions preclude second-guessing of TSA's decisions as to implementing the criteria Congress has established and the discretion as to employment decisions given to TSA. Third, in combination with the notwithstanding clauses, these provisions evidence a clear intent to free TSA from the costs and burdens of litigation in federal court over such decisions.

Every circuit to address the issue has agreed that the language of the ATSA plainly precludes security screeners from bringing suit under certain of the federal employment statutes incorporated under Title 5 of the United States Code, including the Rehabilitation Act. See, e.g., Joren v. Napolitano, 633 F.3d 1144, 1146 (7th Cir. 2011), reh'g en banc denied, 2011 U.S. App. LEXIS 5254 (7th Cir. Mar. 9, 2011), cert. denied, 2011 WL 4535993 (U.S. Oct. 3, 2011) ("We now join every other circuit to have considered the question and conclude that the plain language of the ATSA preempts application of the Rehabilitation Act to security screeners."); Castro v. Sec'y of Homeland Sec., 472 F.3d 1334, 1337 (11th Cir. 2006) ("The plain language of the ATSA indicates that TSA need not take the requirements of the Rehabilitation Act into account when formulating hiring standards for screeners."); Conyers v. Merit Sys. Prot. Bd., 388 F.3d 1380, 1383 (Fed. Cir. 2004)

-15-

("Section 111(d) of the ATSA exempts TSA from laws that otherwise would apply to screener positions."); see also Conyers v. Rossides, 558 F.3d 137, 148 (2d Cir. 2009) (holding that "the [TSA] Administrator's decision not to utilize the [Federal Aviation Administration]'s personnel management system in deciding whom to 'employ' or 'appoint' as a security screener, 'is committed to agency discretion' by ATSA Section 111(d) and, thus, is not reviewable under the [Administrative Procedure Act]") (quoting 5 U.S.C. § 701(a)).

Despite the unequivocally plain language of the ATSA, plaintiff argues that Congress could not have intended to deny security screeners the ability to sue under the Rehabilitation Act. To the contrary, not only is the reason for the ATSA's preclusion of suit under the Rehabilitation Act self-evident, but the Congressional history makes clear the intent to do so.

The original version of the proposed ATSA made the provisions of Title 5 of the United States Code, including the Rehabilitation Act, applicable to all screeners hired.[8] Conyers,

---

[8] The original proposed language read: "The Secretary of Transportation is authorized to employ, appoint, and fix the compensation of such a number of individuals as may be necessary to carry out sections 44901 and 44903 of title 49, United States Code, in accordance with the provisions of part III of title 5, United States Code, without regard to any limitation on number of employees imposed by any other law or Executive Order." S. 1447, 107th Cong. § 10 (as placed on Senate Calendar Sept. 24, 2001). The Rehabilitation Act is incorporated under part III of title 5 of the United States Code. See 5 U.S.C. § 2302(b)(1)(D), (d)(4).

-16-

558 F.3d at 140. However, before enacting the ATSA, Congress rejected that concept and replaced the original language with the statute's current language in § 111(d) in order "[t]o authorize the employment, suspension, and termination of airport passenger security screeners without regard to the provisions of title 5, United States Code, otherwise applicable to such employees." 147 Cong. Rec. S10,520 (daily ed. Oct. 11, 2001) (voice vote passing amendment 1881).

Several members of Congress expressed their understanding that § 111(d) gave the TSA Administrator "the authority to determine whether [screeners] can join a union; participate in the Federal Employees Health Benefit Plan and retirement options; and be covered by non-discrimination, health and safety, and whistleblower laws." 147 Cong. Rec. H8313 (daily ed. Nov. 16, 2001) (statement of Rep. Schakowsky); see also 147 Cong. Rec. S11,982 (daily ed. Nov. 16, 2001) (statement of Sen. Rockefeller) (expressing the understanding that under the ATSA "health care, worker's compensation, and civil rights and whistleblower protection . . . are left to the discretion of the" TSA Administrator).

Plaintiff's fallback argument is that the ATSA exempts the TSA from suit under the Rehabilitation Act only insofar as the ATSA enumerates minimum physical and intellectual requirements in § 44935(f). Plaintiff proposes we adopt the view, expressed in

-17-

several EEOC appellate decisions, that TSA's exemption from "the Rehabilitation Act must be determined on a case-by-case basis, in light of the specific allegations made, and will depend on whether there is any conflict between the ATSA-mandated qualifications and the complainant's Rehabilitation Act claim." Chapman v. Chertoff, EEOC Appeal No. 01200510491, 2008 EEOPUB LEXIS 2746, at *7 (Aug. 6, 2008); see Kimble v. Napolitano, EEOC Appeal No. 0120072195, 2009 EEOPUB LEXIS 3302, at *2 (Nov. 24, 2009); Getzlow v. Chertoff, EEOC Appeal No. 0120053286, 2007 EEOPUB LEXIS 2508, at *8-9 (June 26, 2007).

We reject this argument. Congress gave the EEOC no role to play in interpreting the ATSA.[9] Instead, Congress vested primary authority for interpreting the ATSA in the TSA Administrator, 49 U.S.C. § 114(d)-(f), granting the Administrator broad flexibility to develop employment standards beyond those articulated in the statute, id. § 44935(e)(2)(A).

Nor does the EEOC have any particular expertise in airport security needs. See Metzger, Federalism and Federal Agency Reform, 111 Colum. L. Rev. 1, 26 (2011) (describing the Supreme Court's growing wariness of agency interpretations that are "not

_____

[9]   Indeed, the EEOC has no regulations which purport to interpret the ATSA.
By contrast, Congress did direct the TSA to "work in conjunction with" the Federal Aviation Administration and International Civil Aviation Organization, and to "give great weight" to the views of the National Transportation Safety Board. See 49 U.S.C. § 114(f)(13)-(14), (i).

grounded in agency expertise and therefore [do] not merit deference"). Additionally, the EEOC interpretation is contrary to the statute in that it requires engaging in a case-by-case analysis of whether TSA's decisions are correct under the Rehabilitation Act. Congress did not intend such a result.

Plaintiff further argues that because TSA has voluntarily established through its Management Directive a limited version of reasonable accommodation, it has permanently waived its exemption from suit under the Rehabilitation Act. Again, not so. The TSA Management Directive establishing a limited reasonable accommodation program does so pursuant to Executive Order 13,164, which directs federal agencies to adopt reasonable accommodation procedures. See TSA Management Directive No. 1100.73-4 (Jan. 25, 2006) ("Reasonable Accommodation Program"). Significantly, by its terms, Executive Order 13,164 makes clear that the adoption of such procedures "does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, its employees, or any person." Exec. Order No. 13,164, 65 Fed. Reg. 46,565 (July 26, 2000).

In enacting the ATSA, Congress sought not only to give the Administrator "wide latitude to determine the terms of employment of screeners," but also the flexibility to change those terms as necessary to ensure aviation safety. H.R. Rep. No.

107-296, at 64.  Thus, the statute provides that the "Under Secretary shall also review, and revise as necessary, any standard, rule, or regulation governing the employment of individuals as security screening personnel."  49 U.S.C. § 44935(e)(3).  The ATSA's mandate to set and revise terms of employment means that the Administrator's Management Directives cannot constitute waiver of ATSA § 111(d).[10]

### III.

The language of the ATSA makes clear that Field has no cause of action under the Rehabilitation Act.  Should there be abuses in the treatment of screening personnel by the TSA (and we certainly do not suggest that there was any such abuse here), Congress will, no doubt, take note.  The order of the district court is affirmed.  Costs are awarded to TSA.

---

[10]    By parallel reasoning, we would agree with <u>Wong</u> v. <u>Regents of the University of California</u>, 192 F.3d 807 (9th Cir. 1999), that "[a]n an institution's past decision to make a concession to a disabled individual does not obligate it to continue to grant that accommodation in the future."  <u>Id.</u> at 820; <u>cf.</u> <u>Goncalves</u> v. <u>Plymouth Cnty. Sheriff's Dep't</u>, 2011 <u>WL</u> 4715199, at *4 (1st Cir. 2011) (stating that a decision to let an employee advance to the next stage of the hiring process does not constitute an admission that the employee is qualified).