# United States Court of Appeals
## For the First Circuit

---

No. 14-1268

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff, Appellant,

v.

KOHL'S DEPARTMENT STORES, INC.,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

---

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

---

Donna J. Brusoski, Attorney, Office of the General Counsel, with whom P. David López, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, and Jennifer S. Goldstein, Acting Assistant General Counsel, were on brief, for appellant.
Melinda J. Caterine, with whom Fisher & Phillips LLP, was on brief, for appellee.

---

December 19, 2014

---

**TORRUELLA, Circuit Judge.** Appellant Equal Employment Opportunity Commission ("EEOC") asserts that Appellee Kohl's Department Stores, Inc. ("Kohl's") refused to provide former employee Pamela Manning ("Manning") with reasonable accommodations in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. The EEOC also asserts that by failing to comply with the ADA, Kohl's constructively discharged Manning. The district court entered summary judgment in favor of Kohl's on both claims. We affirm.

## I. Background

The following undisputed facts are summarized in the light most favorable to the EEOC, the nonmoving party. See, e.g., McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014). Manning suffers from type I diabetes. In October 2006, Manning was hired as a part-time sales associate at Kohl's. She held this position until January 2008, when she was promoted to a full-time sales associate. As a full-time associate working thirty-six to forty hours per week, Manning worked predictable shifts which usually started no earlier than 9:00 a.m. and ended no later than 7:00 p.m. In January 2010, Kohl's restructured its staffing system nationwide, resulting in a reduction in hours for Manning's department. Manning maintained her full-time status because she performed work for various other departments depending on the store's needs.

-2-

Due to the restructuring, Kohl's scheduled Manning to work various shifts at different times during the day, and her scheduled hours became unpredictable as a result.[1] For example, Manning worked more "swing shifts" -- a night shift followed by an early shift the next day. In March 2010, Manning informed her immediate supervisor, Michelle Barnes ("Barnes"), that working erratic shifts was aggravating her diabetes and endangering her health. Barnes told Manning to obtain a doctor's note to support her accommodation request. Manning visited her endocrinologist, Dr. Irwin Brodsky ("Dr. Brodsky"), who determined that the stress Manning experienced due to working erratic hours deleteriously contributed to her high glucose levels. Dr. Brodsky wrote a letter to the store manager of Kohl's, Tricia Carr ("Carr"), requesting that Kohl's schedule Manning to work "a predictable day shift (9a-5p or 10a-6p)," R. at 74, so that Manning could better manage her stress, glucose level, and insulin therapy.

Upon receiving Dr. Brodsky's letter, Carr contacted Kohl's human resources department seeking guidance in responding to Manning's request. She emailed a copy of the letter to Michael

---

[1] Numerous Kohl's employees testified throughout discovery that full-time associates were expected and required to have "open availability," meaning they could be scheduled to work at any time of the day or night. See R. at 92, 95 (Barnes Dep.); id. at 178 (Gamache Dep.); id. at 370-71, 399-401 (Treichler Dep.); id. at 445 (St. John Dep.); id. at 453 (Wilner Dep.). Full-time associates were also required to work two night or evening shifts each week, and every other weekend as well. See, e.g., id. at 370 (Treichler Dep.).

Treichler ("Treichler") in Human Resources and told him that Manning had submitted a written doctor's "request[] that I accommodate [Manning] with day time hrs only." Id. at 75. Treichler told Carr that with Manning "being a full-time associate[,] she would still need to be required to work nights and weekends and that definitely we would make sure she had no swing shifts, [and] that we would make sure . . . that she really took her breaks." Id. at 160 (Carr Dep.). Treichler asked Carr to meet with Manning and propose the no-swing-shift option. Carr's deposition testimony describing this sequence of events is consistent with an email she received from Treichler responding to her request for guidance, which stated, in part: "Clearly we can not have [Manning] not work nights. BUT, we can work with her to avoid the 'swing shifts' - A [sic] close followed by an open." Id. at 76.

Subsequently, Carr and Barnes arranged to meet with Manning on March 31, 2010, to discuss Manning's concerns. During their meeting, Manning requested "a steady schedule, [but] not specifically 9:00 to 5:00." Id. at 282 (Manning Dep.). As she described it, "I was asking for a midday shift, what I had before, the hours that I had before [the departmental restructuring]." Id. at 281 (Manning Dep.). Manning also expressed a willingness to work on weekends.

Carr responded that she had spoken to "higher-ups" at the corporate management level, and that she could not provide a consistently steady nine-to-five schedule.[2]  Manning became upset,

_____

[2]  This is where the dissent parts ways with our view of the record.  The dissent states that Carr failed to offer Manning any alternative accommodation at the March 31 meeting, even though she had been expressly authorized to offer Manning a schedule with no swing shifts.  The dissent views Carr's failure to bring up the swing shifts as evidence that would allow a jury to find that Kohl's was not making a good faith effort to engage with Manning. We disagree.  While a reasonable jury could have found that Carr was authorized to offer "no swing shifts," and that she did not volunteer this information at her meeting with Manning, we are unable to ascribe the same significance to these facts as does the dissent.

Manning's requested accommodation was, as stated by Dr. Brodsky, "a predictable day shift."  Indeed, at his deposition Dr. Brodsky agreed that in his letter to Kohl's he "asked that Ms. Manning be allowed to work a predictable work shift either nine to five or ten to five."  He further testified that the "only situation . . . about which [he] rendered an opinion is the one that [he] listed in the letter," and he agreed that "any variations beyond the nine a.m. to five p.m. or the [ten] a.m. to six p.m. [schedule] would require [him] to have a further discussion with Ms. Manning[.]"  Manning herself said that she requested "a steady schedule, not specifically 9:00 to 5:00."  No one is in a better position than Manning and her doctor to tell us what Manning's requested accommodation actually was, and the evidence on this point is uncontested.  Manning was not simply asking for "no swing shifts," she was in fact looking to be relieved of the obligation to work night shifts as well.

The uncontested evidence in the record also demonstrates that Carr was never authorized to grant Manning's request.  Indeed, the only evidence is that for Manning to continue working as a full-time associate, Kohl's would continue to require Manning to work nights.  Thus, there is no evidence that Carr refused to extend a requested reasonable accommodation that she had been authorized to give.  This is not a case in which an employer privately decides that it would grant a requested accommodation, but then elects not to offer it as part of strong-arm negotiating tactics in the hopes that the employee would accept something less than he or she originally requested.

-5-

told Carr that she had no choice but to quit because she would go into ketoacidosis[3] or a coma if she continued working unpredictable hours, put her store keys on the table, walked out of Carr's office, and slammed the door. Concerned, Carr followed Manning into the break room outside, asking what she could do to help. During this conversation, Carr attempted to calm Manning down and requested that she reconsider her resignation and discuss other potential accommodations. Manning responded, "Well, you just told me Corporate wouldn't do anything for me." Id. at 458-59 (Manning Medical Examination). Manning did not discuss any alternative accommodations with Carr, but instead cleaned out her locker and left the building. A few days later, on April 2, 2010, Manning contacted the EEOC, seeking to file a discrimination claim.

On April 9, 2010, Carr called Manning to request that she rethink her resignation and consider alternative accommodations for both part-time and full-time work. Manning asked Carr about her schedule, and Carr informed her that she would need to consult with the corporate office about any accommodations. After this phone

---

Given the state of this record, we are unable to agree with the dissent's view of Kohl's negotiating tactics. We do not believe a reasonable jury could find that Kohl's failed to negotiate in good faith based on Carr's authorization to offer "no swing shifts."

[3] Diabetic ketoacidosis is a serious medical complication that is caused by low insulin levels. In response, the body burns fatty acids, causing potentially dangerous levels of acidity to build up in the bloodstream.

-6-

call, Manning had no further contact with anyone at Kohl's. Because it had not heard from Manning, Kohl's treated her departure as voluntary and terminated her employment later that month.

The EEOC brought this current suit on Manning's behalf in the United States District Court for the District of Maine in August 2011. The district court entered summary judgment in favor of Kohl's, concluding on the ADA claim that Manning had failed to engage in an interactive process in good faith and on the constructive discharge claim that a reasonable person in Manning's position would not have felt compelled to resign.

## II. Discussion

The EEOC appeals the district court's grant of summary judgment in favor of Kohl's on both the ADA discrimination claim and the constructive discharge claim. We review a district court's grant of summary judgment de novo. E.g., Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 136 (1st Cir. 2012). We draw "'all reasonable inferences in favor of the nonmoving party,'" id. (quoting Sánchez-Rodríguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012)), "'without deference to . . . the district court,'" id. (quoting Hughes v. Bos. Mut. Life Ins. Co., 26 F.3d 264, 268 (1st Cir. 1994)).

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); accord Acevedo-Parrilla, 696 F.3d at 136. There is no genuine dispute of material fact when the moving party demonstrates that the opposing party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We now examine each of the EEOC's claims, in turn.

## A.  The ADA Discrimination Claim

To establish a case of disability discrimination under the ADA, the EEOC must establish that: "'(1) [Manning] is disabled within the meaning of the ADA, (2) [Manning] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [Kohl's], despite knowing of [Manning]'s disability, did not reasonably accommodate it.'" Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007) (quoting Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003)). The EEOC's failure to satisfy any one of these elements warrants the entry of summary judgment against it as a matter of law. See Celotex Corp., 477 U.S. at 322–23. We bypass any discussion about the first two elements and proceed directly to the third element, the basis for our affirmance.[4]

---

[4]  The district court considered but rejected the argument by Kohl's that Manning was not qualified to perform the "essential functions" of her job (element (2)).  Instead, the district court granted summary judgment to Kohl's under the accommodation issue (element (3)) because it found that Manning failed to engage in the

-8-

Under the third element, an employee's request for accommodation sometimes[5] creates "a duty on the part of the employer to engage in an interactive process." See Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008). The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues. See 29 C.F.R. § 1630.2(o)(3). It requires bilateral cooperation and communication. See Enica, 544 F.3d at 339.

We must emphasize that it is imperative that both the employer and the employee have a duty to engage in good faith, and that empty gestures on the part of the employer will not satisfy the good faith standard. If an employer engages in an interactive process with the employee, in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable

---

interactive process in good faith. We proceed directly to the interactive process analysis because "[w]e may uphold an entry of summary judgement on any basis apparent from the record." McGrath, 757 F.3d at 25.

[5] This court does not regard an employer's participation in the interactive process as an absolute requirement under the ADA. Instead, we have held that we "resolve the issue on a case-by-case basis." Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir. 2001). In this case, we do not need to address whether Kohl's had a duty to engage in an interactive process, since it did in fact initiate such a dialogue with Manning.

accommodations.  See, e.g., id. ("[T]he process requires open communication by both parties, and an employer will not be held liable if it makes 'reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed . . . .'" (last alteration in original) (quoting Phelps v. Optima Health, Inc., 251 F.3d 21, 28 (1st Cir. 2001))); Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999) ("[A]n employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." (quoting Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996))).

Here, the record shows that after Manning left the meeting on March 31, 2010, Carr pursued her, attempted to calm her down, asked her to reconsider her resignation, and requested that she contemplate alternative accommodations.  Manning refused, instead confirming that she quit by cleaning out her locker and departing the building.  Ten days later, Carr called Manning, repeating her request for Manning to reconsider her resignation and to contemplate alternative accommodations.  Manning never responded

to Carr.[6]  Approximately one week after this phone call, Kohl's terminated Manning's employment.

While Kohl's response to Manning's accommodation request may well have been ham-handed, based on the undisputed facts, we cannot find that its subsequent overtures should be construed as empty gestures.[7]  The refusal to give Manning's specific requested accommodation does not necessarily amount to bad faith, so long as the employer makes an earnest attempt to discuss other potential

---

[6]  The record indicates that a member of the EEOC's staff may have told Manning not to continue to participate in the interactive process following her precipitous departure from Kohl's.  During her medical examination, when asked about Carr's April 9, 2010, phone call to Manning, requesting that she reconsider her resignation, this was her response:

> MS. MANNING:  . . . I just wanted to get off the phone as fast as I could.  And then I called --
> DR. BOURNE:  You could not talk?
> MS. MANNING: No.  And I told her that I couldn't talk.
> DR. BOURNE:  Per EEOC's directions?
> MS. MANNING: Yes.

R. at 461-62 (Manning Medical Examination).

Assuming this is what happened, Manning should have been directed to do precisely the opposite: she should have been informed that she was obliged to continue to engage with the interactive process in good faith.  It thus may well be that Manning's current predicament is due to erroneous advice provided by the EEOC.  Such a fact, if true, would be troubling, given the EEOC's duty to investigate discrimination claims and authorize lawsuits.  One would expect that the EEOC should know that an employee's failure to cooperate in an interactive process would doom her ADA claim.

[7]  The EEOC suggests that Kohl's did not act in good faith because Carr's attempts to reconcile with Manning were disingenuous "empty gestures."  As discussed below, the record does not support this assertion.

-11-

reasonable accommodations. Here, Kohl's refused to provide Manning's preferred schedule, but was willing to discuss other schedules that would balance Manning's needs with those of the store. Manning refused to hear what Kohl's had to offer. "'It is difficult to judge the reasonableness of accommodations when the employee withdraws before we can say with any authority what these accommodations would have been.'" Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 225 (5th Cir. 2011) (quoting Loulseged, 178 F.3d at 734). Manning's refusal to participate in the interactive process is the reason why the record lacks facts regarding what reasonable accommodations Kohl's might have offered had Manning cooperated. We conclude that Kohl's acted in good faith when it initiated an interactive process and displayed its willingness to cooperate with Manning, not once but twice, to no effect. See, e.g., Phelps, 251 F.3d at 28.

Furthermore, we conclude that Manning's refusal to participate in further discussions with Kohl's was not a good-faith effort to participate in an interactive process. See, e.g., Enica, 544 F.3d at 339 (quoting Beck, 75 F.3d at 1135); Phelps, 251 F.3d at 28. Indeed, because Manning chose not to follow up with Carr's offer to discuss alternative accommodations, Manning was primarily responsible for the breakdown in the interactive process.[8] See

---

[8] The EEOC cites to Colwell v. Rite Aid Corp., 602 F.3d 495 (3d Cir. 2010) in support of its claim that the refusal by Kohl's to accommodate Manning's requests constituted a termination of the

-12-

Phelps, 251 F.3d at 27 (holding plaintiff responsible for the breakdown in the interactive process when she "failed to cooperate in such a process"); see also Griffin, 661 F.3d at 225 (quoting Loulseged, 178 F.3d at 734).

In sum, when an employer initiates an interactive dialogue in good faith with an employee for the purpose of discussing potential reasonable accommodations for the employee's disability, the employee must engage in a good-faith effort to work out potential solutions with the employer prior to seeking judicial redress. Manning did not do so in this case, and therefore, the EEOC has failed "to make a showing sufficient to establish the existence of an element essential to [its] case . . . ." See Celotex Corp., 477 U.S. at 322. Accordingly, we hold that summary judgment against the EEOC on the ADA discrimination claim is warranted as a matter of law.[9]

**B. The Constructive Discharge Claim**

To establish a claim of constructive discharge, the EEOC must show that Manning's working conditions were "so onerous, abusive, or unpleasant that a reasonable person in [her] position

_____

interactive process. We find Colwell distinguishable, because in that case, the evidence indicated that the employer may have been more responsible for a failure to communicate. See id. at 507–08. Here, Kohl's attempted to communicate with Manning twice, to no effect.

[9]  We must emphasize that our holding is limited to the highly idiosyncratic facts of this case and should not be interpreted as upsetting our current ADA jurisprudence.

-13-

would have felt compelled to resign." Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) (citing Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993)). In other words, work conditions must have been so intolerable that Manning's decision to resign was "void of choice or free will" -- that her only option was to quit. See Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008). This standard is entirely objective -- we do not put weight on the employee's subjective beliefs, "'no matter how sincerely held.'" Id. at 52 (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002)).

Here, the EEOC fails to meet this objective "reasonable person" standard. The EEOC argues that Manning's fears that she would go into ketoacidosis or slip into a coma were objectively reasonable because her doctor told her that continuing to work erratic shifts could cause these serious medical complications. Even assuming, arguendo, that being concerned about these health issues is objectively reasonable, we still find that Manning's choice to resign was "grossly premature, as it was based entirely on [her] own worst-case-scenario assumption" that Kohl's would not provide her with accommodations. See id. According to the record, after Manning left the meeting in Carr's office on March 31, 2010, Carr followed Manning into the break room. Carr gave Manning her first opportunity to reconsider her resignation and offered to discuss other potential accommodations with Manning. Manning

-14-

ignored this first overture, despite seeing that Carr was willing to discuss and negotiate alternative accommodations. On April 9, 2010, Carr called Manning over the phone, repeating her request that Manning reconsider both her resignation and her refusal to discuss alternative accommodations. Manning also ignored this second overture.

"[A]n employee is obliged not to assume the worst, and not to jump to conclusions too [quickly]." Id. (internal quotation marks omitted). Here, Manning not only jumped to a conclusion prematurely, but she also actively disregarded two opportunities to resolve her issues. We agree with the Seventh Circuit that a reasonable person would simply not feel "compelled to resign" when her employer offered to discuss other work arrangements with her. See EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 441 (7th Cir. 2000) ("Instead of discussing the new work schedule[,] . . . [the employee] resigned. While this was certainly her prerogative, we do not believe this was her only option. . . . [W]e cannot conclude that a reasonable person in her position would have been compelled to resign."); see also Torrech-Hernández, 519 F.3d at 50-51. Because we find that a reasonable person in Manning's position would not have concluded that departing from her job was her only available choice, the EEOC has failed to meet the "reasonable person" element for a constructive discharge claim. We

consequently hold that summary judgment against the EEOC on the constructive discharge claim is warranted as a matter of law.

### III. Conclusion

We are sympathetic to Manning's medical issues. Moreover, we note that had the matter ended at the refusal by Kohl's to grant Manning's request for a steady work schedule, Manning might well have had viable causes of action. Yet, for both of her claims, we cannot ignore the multiple subsequent opportunities that Kohl's offered to Manning to discuss alternative reasonable accommodations. Consequently, the facts, even when read in the EEOC's favor, substantiate neither a claim for ADA discrimination nor a claim for constructive discharge. It follows that the district court correctly granted summary judgment in favor of Kohl's on both claims.

**AFFIRMED**.

**-Dissenting Opinion Follows-**

**KAYATTA, Circuit Judge, dissenting**. A reasonable jury could properly view the facts in this case very differently than does the majority. So viewed, those facts should preclude summary judgment unless we are to bless as a matter of law a negotiating tactic that is unfair to disabled employees who reasonably believe that they confront imminent serious harm if an accommodation is not provided. To explain why this is so, I begin with a brief example of how a reasonably competent plaintiff's lawyer would fairly describe the well-supported facts to a jury, and I then follow with an analysis of why those facts could support a verdict in EEOC's favor. Finally, I explain why it follows that the constructive discharge claim should survive as well.

## I. The Facts

Fending off the stress-induced exacerbation of a life-threatening condition, and believing that she faced imminent serious harm if she could not secure an accommodation, Manning requested less erratic work hours--especially no swing shifts--to allow her to work without suffering harmful medical consequences. Kohl's demanded that Manning provide a note from her doctor, which she then did. Dr. Brodsky's note focused on the problem caused Manning by swing shifts in particular. He explained that, as someone with type 1 diabetes, Manning "takes five daily injections of insulin that must be timed to match her meals and activity," but that she was "having difficulty matching her insulin action to her

work schedule in your store when she swings shifts (e.g. working late shift one day and returning for an early shift the next day)." Dr. Brodsky's note further informed Kohl's that "[a] more predictable and regular schedule should help smooth her blood sugar control and help prevent serious complications of diabetes." Although the note referenced, parenthetically, 9:00 a.m. to 5:00 p.m. and 10:00 a.m. to 6:00 p.m. shifts, a fact-finder could reasonably conclude that the doctor offered those shifts simply as acceptable examples, and that Manning merely requested a consistent day-to-day schedule as a way of avoiding swing shifts. The district court therefore properly operated on the premise that Manning's request was for a "more regular and predictable schedule," somewhere between the hours of 6:00 a.m. and 8:00 p.m., that did not include swing shifts.[10]

Manning repeated her request for a steady work schedule and no swing shifts during the meeting with store manager Carr and assistant store manager Barnes. In response, Carr and Barnes left Manning with the impression that no individual accommodation would

_____

[10] Rather than focus on how Kohl's may have reasonably interpreted Manning's request, including Dr. Brodsky's note, the majority asks the wrong question: How did Dr. Brodsky interpret his note at his later deposition? The majority then illogically declares that interpretation to be the reading that a jury must assume Kohl's actually adopted. In any event, as I explain in the body of this dissent, infra, a jury could easily find Kohl's responsible for the breakdown in the interactive process not because it rejected Manning's request (however interpreted), but because it failed to offer even the accommodation it determined it could make.

-18-

be forthcoming.  Specifically, Carr told Manning that if she gave Manning the scheduling accommodation Manning wanted, then she would have to do that for everyone else at the store.  Barnes reinforced this point by telling Manning that "we were keeping to consistency in regards to all full timers in the building and their schedules." Carr further explained that "the needs of the business dictate[d] when [Manning] work[ed]" and "would require at times shifts that are early, days, mids and closes."  These statements, taken together, basically told Manning that Kohl's would not offer Manning any scheduling accommodation that was not both available to all other workers and compatible with a business need to have fluctuating shifts.[11]  As a concrete demonstration of this point, Carr and Barnes flatly rejected the accommodation Manning requested and, importantly, offered her no alternative accommodation even though Kohl's--through HR manager Treichler--had already expressly authorized Carr to offer Manning a schedule with no swing shifts, the availability of which did not turn on its being offered to all other employees as Carr falsely told Manning.

_____

[11]  The majority correctly notes that Kohl's employees testified that full-time employees were required to work two night shifts per week and have "open availability," or the flexibility to work any time of the day, although it appears that this scheduling expectation was not recorded in writing.  However, there is also testimony in the record that exceptions to this scheduling practice were "pretty regularly" made, and "there was a fair amount of leeway within those [full-time] positions."  The district court therefore considered it disputed that open availability and working two night shifts per week were strict requirements for full-time employees.

With a vulnerable employee known to Kohl's to believe she faced imminent harm if her shifts could not be changed, the negotiating tactics employed by Carr and Barnes caused Manning to flee the one-sided discussions and announce that she had no choice but to quit. It is true that Carr chased after Manning and spoke with her in the break room, and then called her again ten days later. But in neither conversation did Carr propose alternative accommodations, request other information, or otherwise indicate that Kohl's had relented. In the break room, Carr failed to suggest any accommodation, including the accommodation that Carr knew she could offer and that Manning's doctor said she most needed--no swing shifts. During the second conversation, by phone on April 9, Manning asked about her work schedule after Carr asked her to consider other accommodations for full-time and part-time employment (none of which Carr actually offered, or even said she had authority to offer).[12] Carr replied that she would need to consult with the corporate office about any schedule accommodations, in contradiction with the corporate office's earlier authorization for Carr to avoid scheduling Manning for swing shifts. Four times unable to get a specific counteroffer from Kohl's of any accommodation, and told that the person she was

---

[12] Although part-time employment can be a reasonable accommodation, 29 U.S.C. § 12111(9)(b), Kohl's knew that it was not the volume of work that jeopardized Manning's health, but its erratic distribution.

speaking to didn't even have any authority to offer one, Manning gave up and moved on.

## II. The Interactive Process

My colleagues point to nothing in the foregoing presentation of the evidence that lacks support in the record. They nevertheless conclude that Manning forfeited her rights under the ADA because she was not more resilient in the face of Kohl's negotiating tactics. This conclusion misapprehends the nature of the interactive process. While Kohl's approach (as described by Manning) might be well-suited in some hard-edged business or diplomatic negotiations, it fits poorly with the type of "good faith," "interactive process" that the applicable regulations require here. 29 C.F.R. § 1630.2(o)(3)[13]; see Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008). The EEOC's interpretive guidance directs employers to use a "problem solving approach" to identify reasonable accommodations in consultation with the employee. 29 C.F.R. app. § 1630.9.[14] Pursuit of this problem-

---

[13]   29 C.F.R. § 1630.2(o)(3) provides that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."

[14]   The EEOC's interpretive guidance on the ADA provides, in relevant part, that

   When an individual with a disability has requested
   a reasonable accommodation to assist in the performance

-21-

solving approach requires that the employer, once it becomes aware of the disability of an employee, "engage in a meaningful dialogue with the employee to find the best means of accommodating that disability." Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005). Interactive discussions should involve "a flexible give-and-take with the disabled employee so that together they can determine what accommodation would enable the employee to continue working." EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005). Here, Kohl's did not give even what it could easily give.

Accepting as we must for summary judgment purposes the foregoing presentation of the facts--all well-supported by

---

of a job, the employer, using a problem solving approach, should:

(1) Analyze the particular job involved and determine its purpose and essential functions;

(2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

(3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

(4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

29 C.F.R. app. § 1630.9.

competent proof in the record--it seems most unfair to say that Manning forfeited her rights under the ADA. Manning communicated to Kohl's the fact that she was disabled, she provided specific medical evidence describing how the swing shifts threatened her health, and she proposed a specific but flexible accommodation. In other words, she did everything necessary to enable Kohl's to determine whether any accommodation was reasonably possible. Cf. Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 225 (5th Cir. 2011) (employee failed to provide information to show that his requested accommodation was necessary to manage his diabetes). Indeed, Kohl's did determine that an accommodation was possible; it simply never offered it.

The obligation to engage in the interactive process in good faith arises out of a need to see to it that an employer receives the information necessary to determine whether an accommodation is needed, and why. See 29 C.F.R. app. § 1630.9. Kohl's had all that information, and required nothing more (including Manning's agreement) to offer that which it had already determined it could accommodate. The majority seems to conclude that because Treichler did not authorize Carr to offer Manning the most favorable accommodation of "a predictable day shift," Carr's failure to at least offer Manning "no swing shifts" is not evidence of lack of good faith. In the majority's words, Carr did not refuse "to extend a requested reasonable accommodation that she had

-23-

been authorized to give" (emphasis added).  There are two problems with this argument.

First, on this record, a jury might well conclude that Kohl's actually understood that the key thing Manning needed and that she sought was consistency in the form of no swing shifts. Dr. Brodsky's note clearly emphasized the problem swing shifts posed for Manning's blood sugar control.  Indeed, Treichler's response to Carr shows that he at least interpreted the doctor's note as requesting no swing shifts: "Clearly we can not [sic] have her not work nights.  BUT, we can work with her to avoid the 'swing shifts'--A [sic] close followed by an open."  And Carr documented in an email that Manning asked her simply, and generally, "why she couldn't have a more day to day consistent schedule."

Second, let's assume that the majority is correct, i.e., that Manning's request could only be interpreted as a request for something more than no swing shifts, and that Treichler only authorized Carr to offer an end to swing shifts.  The fact remains, Carr never offered anything, and (if Manning is to be believed) a jury could find that Carr and Barnes actively misled Manning into believing that they could offer no accommodation that was not consistent with the schedules of "all full timers" or available to everyone else.  I would think that a jury could find that such tactics fell far enough short of "good faith" participation in an "interactive," "problem solving" process so as to place on Kohl's

-24-

some of the blame for the breakdown of that process.  Instead, the majority rewards Kohl's for withholding even the accommodation it could make--and misrepresenting its availability--by declaring that Kohl's wins the whole case as a matter of law.  All the employer now need do is keep its lips moving, not offer anything, imply that it cannot offer what even it determines it clearly can, and hope that the employee becomes disheartened enough to give up.

The majority's language betrays a failure to focus on the role of a jury in this case.  The majority observes that Kohl's negotiating tactics did not "<u>necessarily</u> amount to bad faith" (emphasis added), so long as it was "earnest."  I agree.  Therefore the EEOC does not win on summary judgment.  Why Kohl's wins, though, is not explained.  To be blunt, what exactly did Kohl's say that could not be viewed as an empty gesture, or worse?  Kohl's had two chances to offer no swing shifts, it never offered anything, and the party who did make an offer and supply requested information (Manning) loses as a matter of law?

It would therefore appear that the majority reserves a heightened judicial scrutiny for breakdowns in the interactive process only when the employee may have erred.  In <u>Jacques</u> v. <u>Clean-Up Group, Inc.</u>, 96 F.3d 506 (1st Cir. 1996), the employer entirely failed to engage in any interactive process, apparently unaware of its obligation to do so, and claimed to have interpreted the employee's request for an accommodation as an "implicit

refusal" to accept a work assignment. Id. at 515. Our court acknowledged that it was "painfully aware that the [employer's] failure to engage in an informal interactive process with [the employee] regarding accommodation options beyond those which he requested results from its failure to be properly informed of its obligations under the ADA." Id. We nonetheless sustained a jury verdict for the employer, noting that "cases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior." Id. Somehow, then, a reasonable jury could find that the oblivious employer in Jacques did not forfeit its rights, but, according to the majority in this case, no reasonable jury could find that Manning preserved hers. And this is apparently so even though Kohl's, like the employee in Jacques, "was just as well situated, if not better so, to investigate and suggest other alternatives." Id. at 514.

Certainly no precedent compels the hard-edged view adopted by the majority as a pronouncement with which no jury could reasonably disagree. In exonerating the employer in Tobin, our court stated that "[t]his is not an instance where the employer . . . simply rejected any request for accommodation without further discussion." Tobin, 433 F.3d at 109. Unlike the "great deal of discussion" and "significant action on the part of company officials" in Tobin, id., a jury could find in this case that

-26-

Kohl's discussed only in form, not substance, and did not act at all.

Instead, Kohl's approach is closer to that of the employer in <u>Colwell</u> v. <u>Rite Aid</u>, 602 F.3d 495 (3d Cir. 2010). There, the employer's manager rejected the requests of a partially blind employee, who could not drive at night, to be scheduled for daytime shifts only. <u>Id.</u> at 498-99. The Third Circuit concluded that the manager's subsequent agreement to a meeting with an employee, without more, would not compel a jury to find that the employer was willing to negotiate in good faith after the manager "had flatly refused all of [the employee's] overtures," and the employer "d[id] not assert that [the manager] was willing to offer any accommodations," even though the employee quit before the meeting. <u>Id.</u> at 507-08; <u>see also</u> <u>Sears, Roebuck & Co</u>, 417 F.3d at 806 ("The last act in the interactive process is not always the cause of a breakdown . . . and courts must examine the process as a whole . . . .").

The majority quotes <u>Enica</u> and <u>Phelps</u> for the proposition that "the process requires open communication by both parties, and an employer will not be held liable if it makes 'reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed.'" <u>Enica</u>, 544 F.3d at 339 (quoting <u>Phelps</u> v. <u>Optima Health, Inc.</u>, 251 F.3d 21, 28 (1st Cir. 2001)). A jury could certainly find that Kohl's did not make

reasonable efforts to provide accommodations based on the information it possessed. Indeed, it did not even make a reasonable effort to provide the accommodation it knew it could provide. By contrast, in Phelps the employer actually offered several potential alternative accommodations, and the employee conceded that she refused to participate in the interactive process. Phelps, 251 F.3d at 27-28. Likewise, in Enica the employer did offer and agree to several accommodations during months of back-and-forth with the employee. Enica, 544 F.3d at 340-42. Kohl's, however, offered nothing.

### III. The Constructive Discharge

Because a reasonable jury could find that Manning reasonably believed that no accommodation was forthcoming or possible, and that further work without an accommodation posed a serious health risk, a jury that found Kohl's could have reasonably accommodated Manning's needs could also conclude that Kohl's constructively discharged Manning by not doing so. The lack of an accommodation made Manning's working conditions "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign," resulting in constructive discharge. De La Vega v. San Juan Star, Inc., 377 F.3d 111, 117 (1st Cir. 2004) (quotation marks omitted) (alteration in original). Manning's doctor's note is clear that the erratic work schedule "induce[d] additional stress and more sugar fluctuation" and that Manning's

"diabetes control ha[d] recently deteriorated and exhibit[ed] a clear stress pattern." That deterioration raised the prospect of ketoacidosis or a coma. Kohl's unwillingness to give Manning a predictable schedule subjected Manning to working conditions that threatened her health. Surely a jury could find such a threat sufficiently daunting as to compel Manning to defend herself by refusing to work without the required protection.

Although there may be cases in which an employer fails to accommodate but does not constructively discharge an employee, as when working without an accommodation does not jeopardize the employee's health, here Manning's work schedule put her in harm's way. The "choice" between working a schedule that exacerbates a serious medical condition and resigning is not really a choice at all, and certainly not one that employees should have to make. See Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008) ("[I]n order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will.").

## IV. Conclusion

As best as I can tell, this is the first time that any circuit court has held that an employer can reject an accommodation request backed up by a doctor's note, refuse to offer an accommodation that it has determined it can make, falsely claim that any accommodation must be offered to all workers whether disabled or not, and then declare the employee's ADA rights

-29-

forfeited when she gives up.  Such a holding demands too much resilience and persistence on the part of a disabled and stressed-out employee, and takes away from jurors a task they are well-suited to perform.  I respectfully dissent.